UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
JULIAN ROSARIO and          *    Case No. 10-CV-5255 (ERK)
MARIA GOMEZ,                 *
                            *    Brooklyn, New York
            Plaintiffs,     *    January 18, 2012
                            *
    v.                      *
                            *
VALENTINE AVENUE DISCOUNT    *
STORE, CO., INC., et al.,    *
                            *
            Defendants.     *
                            *
* * * * * * * * * * * * * * *
```

TRANSCRIPT OF CIVIL CAUSE FOR HEARING
BEFORE THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:          MICHAEL J. BORRELLI, ESQ.
                             Borrelli & Associates, P.C.
                             One Old Country Road, Ste. 347
                             Carle Place, NY  11514

For the Defendant:           GEORGE T. PETERS, ESQ.
                             Law Office of George T. Peters
                             401 West 145th Street, 2nd Fl.
                             New York, NY  10031

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1       (Proceedings commenced at 3:06 p.m.)

2           THE CLERK:  Civil cause for hearing, docket no. 10-

3  CV-5255, Rosario against Valentine Avenue Discount Store Co.,

4  Inc., *et al*.

5           Will the parties please state your names for the

6  record.

7           MR. BORRELLI:  Michael Borrelli for the plaintiffs.

8  Good afternoon, Your Honor.

9           MR. PETERS:  And George T. Peters for the

10  defendants.  Good afternoon.

11          THE CLERK:  The Honorable Lois Bloom presiding.

12          THE COURT:  Good afternoon, Mr. Borrelli and Mr.

13  Peters and I note for the record that Mr. Peters has

14  apparently brought Mr. Srour.  Is that correct?

15          MR. SROUR:  Yes.  Yes.

16          THE COURT:  Good afternoon, Mr. Srour.  I set this

17  hearing in plaintiff's civil action under the Fair Labor

18  Standards Act and New York Labor Law.

19      As you are,or should have been made aware by your

20  attorney, the Court granted a motion for conditional

21  certification as a collective action and directed defendants

22  to produce the names, last known addresses, telephone numbers

23  and dates of employment for potential opt-in plaintiffs at

24  the stores that are named as defendants in this action.

25          Those deadlines for providing the information were

3

1   extended and then the Court had a telephone conference where

2   Mr. Peters for the first time appeared on your behalf, Mr.

3   Srour, and this was on plaintiff's motion to compel

4   defendants to produce the opt-in information that had

5   previously been ordered.  There had been no request to extend

6   the time.

7           Mr. Peters, even though he was new counsel, was on

8   notice that the Court's deadline for filing the information

9   was extended only until November 30th.  At the telephone

10  conference on January 5th, I said that the letter that had

11  been submitted by defendants was inadequate and that there

12  would have to be further information.  I was giving your

13  attorney a last chance to submit information.

14          At the last status conference which was

15  January 13th, defendants proferred an unsworn affidavit by

16  you, Mr. Srour, with a list of names and addresses of

17  employees from 11 stores.  I found the submission to be

18  insufficient as there was no sworn statement by you.

19          There was nothing specifying what efforts had been

20  made to locate the employee information, how the information

21  that was being provided was located and it specifically

22  directed you to post the notice in the store and your

23  declaration stated that the notice will be posted in two

24  stores that remain open.

25          So I again gave defendants time to file a sworn

4

1   affidavit by yesterday.  I still haven't seen any sworn

2   affidavit, Mr. Peters.

3           MR. PETERS:  Correct, Your Honor.  The submission

4   if it were to have been submitted yesterday would have been

5   incomplete.  As such, I brought Mr. Srour here to answer any

6   and all questions.  He's attempting to get the discovery

7   still and he can proceed if it's all right with the Court.

8           THE COURT:  I don't really understand what you and

9   Mr. Srour are thinking.

10          If you're told to file something and you don't have

11  enough time, you make an application to the Court on notice

12  to the other side stating what efforts you have made to

13  comply with the Court's order and how much time you need.

14  You don't just leave it and say well, we didn't really have

15  all the information so we decided to file nothing.

16          Do you understand your client is threatened with

17  sanctions which could include contempt of Court?  I'm glad

18  he's here so that we don't have to reach the issue of whether

19  he wilfully violated the Court's order by failing to appear.

20  Has he brought the records that he's been directed to bring?

21          MR. PETERS:  I have the records, Your Honor.

22          THE COURT:  And have you --

23          MR. PETERS:  Some of them.

24          THE COURT:  -- have you shown them to Mr. Borrelli?

25          MR. PETERS:  As yet, I have not, Your Honor.

5

1          THE COURT:  Again, this is not the way we operate

2    in Federal Court, Mr. Peters and Mr. Srour.  I want you to

3    understand this is a Fair Labor Standards Act case which

4    means you under the law have the burden to produce the

5    payroll records showing what you paid these people, how many

6    hours they worked.  This is your burden as the employer.

7          And for whatever your reasons are to be given three

8    chances to comply with an order from back in November, you

9    understand that this -- well, I'm going to have you sworn to

10   the truth of your testimony.  I'm not going to just let you

11   speak.  Your attorney's here to speak for you. Mr. Borrelli,

12   this is now how we generally proceed in these cases.

13         So I did grant your motion to compel, but I'm not

14   going to do all the work for plaintiffs, either.  Have you

15   thought about what the proper way to go about getting the

16   information you need is in light of the fact that I made Mr.

17   Srour appear today?

18         MR. BORRELLI:  I hadn't given it much thought yet,

19   Your Honor.  I honestly didn't think that the defendants

20   would wilfully fail to comply with Your Honor's order on

21   three separate occasions so I was -- I'm sort of

22   flabbergasted.  We can certainly start subpoenaing, you

23   know -- we can't subpoena anything from that information of

24   payroll companies or bank records or something.

25         THE COURT:  Well, again, that's what I believe Mr.

6

1    Srour is going to have to testify to today under penalty of

2    perjury.  I'll have him sworn to the truth of his statements

3    and we'll put it on the record.

4          But again, this is not protecting your client's

5    interests, Mr. Peters, because if he swears to things on the

6    record today in open court and they turn out not to be true,

7    he could be prosecuted by the United States Attorney for

8    making false statements in a federal courtroom.

9          MR. PETERS:  I understand, Your Honor, and to my

10   knowledge, he's not going to make any untrue statements.

11         THE COURT:  I understand it, but you're telling me

12   you have documents that you haven't given to Mr. Borrelli

13   yet.  What is it that you're thinking here?

14         MR. PETERS:  What I'm thinking is that the

15   documents that I received are -- would not be in compliance

16   with the Court's order.  As yet, I have not received things

17   that I can produce to the Court to opposing counsel that

18   would be sufficient.  As such, we're here today.

19         MR. BORRELLI:  Your Honor, I don't understand when

20   a Federal judge gives you an order, you have one choice and

21   that is to comply with that order.  At this point, my clients

22   are being prejudiced every day that this prolongs itself.

23   There are plaintiffs that are losing with the right to

24   opt-in --

25         THE COURT:  They are potentially.

7

1      MR. BORRELLI:  Oh, exactly.  Potentially.

2      THE COURT:  And that could be dealt with at the

3  other end and I'm not ready to address what the potential

4  prejudice would be.  I do understand statute of limitations

5  is from the date that they opt-in.  I understand him dragging

6  his feet and turning over this information is not good for

7  the potential opt-in plaintiffs, but we're not there yet, Mr.

8  Borrelli.

9      I'm flabbergasted, too, but imposing sanctions on

10  him to make him comply such as a monetary penalty by day or

11  week, I don't know how that helps your client, either.

12      MR. BORRELLI:  I would certainly think it would

13  motivate the defendant to act a little more compliance with

14  Your Honor's orders.

15      THE COURT:  Well, why don't we call Mr. Srour to

16  the stand, swear him to the truth of his testimony and let

17  some of the questions be answered about where these records

18  are and why he's failed to produce these records.  Mr. Srour,

19  are you prepared to do that today?

20      MR. SROUR:  Yes.

21      THE COURT:  Again, I want you to come up to the

22  witness stand, then.  Stay standing for a moment and raise

23  your right hand, please.

24      (The witness is sworn.)

25      THE COURT:  Please be seated.  State your full name

8

1      and address for the record.

2                MR. SWORN:  My name Raymond Srour and I live in 922

3      Avenue R in Brooklyn, New York.

4                THE COURT:  And Mr. Srour, what is your

5      relationship to the Valentine Avenue Discount Store and the

6      other defendants that are named in this lawsuit?

7                MR. SROUR:  I am the operator of those companies.

8                THE COURT:  What does "the operator" mean?  Are you

9      the sole owner, sir?

10               MR. SROUR:  No, I'm not the sole owner in some of

11     the companies.

12               THE COURT:  Who else owns the companies with you?

13               MR. SROUR:  I started my business since 1980 and I

14     have two partners that went in together.

15               THE COURT:  And what are the partners' names?

16               MR. SROUR:  One was my brother Freddie Srour and

17     the other partner I have is Nathan Avidan.

18               THE COURT:  How do you spell his name?

19               MR. SROUR:  A-V-I-D-A-N.

20               THE COURT:  A-V-I-D-A-N?

21               MR. SWORN:  Nathan.

22               THE COURT:  And are they still partners in these

23     stores?

24               MR. SROUR:  No.  In 2006 we split up.

25               THE COURT:  And so now you're the sole owner?

1              MR. SROUR:  Yes.  Now I'm a sole owner.

2              THE COURT:  And how many stores do you own and

3      operate, sir?

4              MR. SROUR:  As of today?

5              THE COURT:  Yes.

6              MR. SROUR:  As of today, I operate two stores on my

7      own and I have four stores with other partners.

8              THE COURT:  The two stores that you operate on your

9      own?  What are the names of those stores and the addresses?

10             MR. SROUR:  Bergament Outlet Center in 3621 13th

11     Avenue.

12             THE COURT:  And where is that?

13             MR. SROUR:  Brooklyn, New York.  And I operate the

14     store on 1818 86th Street.

15             THE COURT:  And what's the name of that?

16             MR. SROUR:  In Brooklyn.  American Place of 86th

17     Street.

18             THE COURT:  And that's 1886 --

19             MR. SROUR:  1818 86th Street.

20             THE COURT:  And you're the sole owner of those two

21     stores?

22             MR. SROUR:  Yes.

23             THE COURT:  And I am going to show you what was

24     given to the Court last time by your counsel.  It is an

25     exhibit to -- and I don't have the document number of the

1    last order of the Court.  It's 37.

2          It's an exhibit to 37 and it's listed as

3    declaration of Raymond Srour and there's -- there are a

4    number of other stores that are listed on the front which

5    were named as defendants in this action and from what I can

6    tell even though it wasn't a sworn declaration, there are

7    eight stores that were open in the statutory period that

8    we're concerned with here and nine stores where you provided

9    no or incomplete information.

10         Tell me what efforts have been made to provide the

11   information that the Court directed you to provide back in

12   November.

13         MR. SROUR:  Your Honor, when I got the lawsuit back

14   last year, I looked around to find an attorney to help me out

15   with this.  Finally I got to Jeff Meyers, my former attorney,

16   and I gave him all the paperwork.  He asked me how much -- I

17   gave him a check and he said he will take care of it.

18         I tell you honestly he didn't call me until

19   November last year.  He told me I have to see you to ask you

20   for a few things.  I said okay.  I went to see him in his

21   office.  That's the second meeting I ever had with him and he

22   just hand me a huge bill and I tell him what's happening with

23   the case?  He says I'm taking care of it and he said I need

24   some documentation for the court and payroll documentation.

25   I looked at his bill.  I was in shock.  I tell him I'm going

1    to take it out.  I tell him give me the file.  He says

2    everything's on-line.

3              So then that's when I went to George Peters, that

4    he's in the neighborhood where I had the stores and I hired

5    him, so I asked the Court that whatever documents that you

6    need I will have.

7              I have a lot of them I gave to Mr. Peters, but if I

8    know exactly what you need, what dates you need, I will get

9    them for the Court and I'm doing to do whatever it takes.

10   Now I know how serious this job is and I will do --

11             THE COURT:  Look, sir.  I'm not allowed to inquire

12   into what happened between you and your attorney.

13             MR. SROUR:  I understand.

14             THE COURT:  But you're a businessman.

15             MR. SROUR:  Yes.

16             THE COURT:  You're running more than a couple of

17   businesses.  You put something into a lawyer's hand you never

18   check back in?  You just wait for him to call you?  And

19   again, that he asked you for information and you were shocked

20   at his bill and that you went to a different lawyer -- all of

21   that is --

22             MR. SROUR:  Irrelevant.

23             THE COURT:  -- it doesn't really answer the

24   question, sir.

25             MR. SROUR:  Oh.

1    THE COURT:  There were two different things that

2    were submitted to the Court.  One was by your former attorney

3    when he asked for more time basically saying that he was

4    looking for the information and that it would take a little

5    more time to provide the information.  This was document 28

6    filed by Mr. Meyer on November 17th.

7    It says in light of closure of a number of the

8    named corporate defendants and/or the fact that said

9    corporate defendants have not been in business for a

10   significant period of time, compiling the responsive

11   information has been extraordinarily difficult and time-

12   consuming.  Which leads the Court to believe that there was

13   some effort being made to compile that information.

14   They only asked for an extension for 12 days to

15   give that information to the Court.  Now you're telling me

16   that there was never a communication to tell you to compile

17   the payroll account records?

18   MR. SROUR:  He didn't tell me anything.  That's why

19   I -- part of the 12 days was just for me to see him and pay

20   him his money.  I mean, I don't think that -- but --

21   THE COURT:  Sir, your payroll records from all of

22   these stores are required --

23   MR. SROUR:  Yes.

24   THE COURT:  -- to be produced.

25   MR. SROUR:  I will --

1          THE COURT:  Who does the payroll records?

2          MR. SROUR:  I have each store done individually.

3          THE COURT:  By who?

4          MR. SROUR:  By the manager.  We have them anyway by

5   Paychex, the company that we can get whatever we're missing.

6          THE COURT:  What is the company that did the

7   paychecks?

8          MR. SROUR:  All the companies, they do with

9   Paychex.

10          THE COURT:  Sir, you're not answering the question.

11          MR. SROUR:  Oh.  All right.

12          THE COURT:  You're saying there was some manager in

13   each store that did your record-keeping.

14          MR. SROUR:  Yes.

15          THE COURT:  And then somebody else issued the

16   paychecks.

17          MR. SROUR:  No, no.  What we do is that we give the

18   information to the Paychex company.

19          THE COURT:  Who is the paycheck company?

20          MR. SROUR:  The paycheck company is -- the name is

21   Paychex.

22          THE COURT:  And so how --

23          MR. SROUR:  It's a -- it's a --

24          THE COURT:  -- come you haven't contacted Paychex

25   to get them to produce the information?

14

1          MR. SROUR:  I did contact Paychex and they gave me

2     all the 2011 employees.  I have them.

3          THE COURT:  I'm not asking for 2011 only.

4          MR. SROUR:  Yes.  I'm going to get also 2010 and

5     2009.

6          THE COURT:  Where does Paychex -- what is the

7     address of Paychex?

8          MR. SROUR:  New Jersey.  I don't know really

9     exactly.  I have their e-mail.  I have the contact person.  I

10    could give it to --

11         THE COURT:  And they have been doing all of the

12    payroll for all of the stores --

13         MR. SROUR:  Yes.

14         THE COURT:  -- for all the years --

15         MR. SROUR:  Yes.

16         THE COURT:  -- that you've been in business?

17         MR. SROUR:  Yes.

18         THE COURT:  Why didn't you make a demand on them to

19    produce all of that to comply with the Court's order?

20         MR. SROUR:  I just -- when George told me three

21    days ago that or last week that you have to get those

22    records, I contacted them.  I got some -- the 2011 we got and

23    I ordered also -- I can order the 2010, 2009.  They can get

24    for us.  We have to pay a fee for that and they can get it

25    for us.

1          THE COURT:  Again, sir, you don't understand what

2     you're up against here.  I could be today sanctioning you

3     every day that these records are not produced.

4          MR. SROUR:  No, I will produce them.

5          THE COURT:  And there was a letter submitted by Mr.

6     Peters to the Court on December 23rd.  It again said that a

7     number of the defendants have stopped doing business and have

8     not been in business for a significant period of time and

9     they talk about the loss of employee files because a building

10    collapsed or were destroyed by snow.  What is this about?

11         MR. SROUR:  This is a loss we had in the store in

12    13th Avenue.  We had a snowstorm that collapsed the whole

13    roof and we lost a lot of files.  We lost a lot of stuff

14    and --

15         THE COURT:  When was the snowstorm and when were

16    the fires, Mr. Srour?

17         MR. SROUR:  Not fires.  Not fire.

18         THE COURT:  What did you say?  Files?

19         MR. SROUR:  Files, yes.

20         THE COURT:  It's not kept on a computer?

21         MR. SROUR:  No, we didn't have that.  We don't have

22    it.

23         THE COURT:  You have no computerized records of

24    your employees?

25         MR. SROUR:  No, because Paychex keep all the

16

1    records.

2             THE COURT:  So Paychex should be able to produce

3    this --

4             MR. SROUR:  Yes.

5             THE COURT:  -- information --

6             MR. SROUR:  Yes.

7             THE COURT:  -- within two -- within a couple of

8    days.  And you should have been asking for this since back in

9    November.

10            MR. SROUR:  I was -- honestly, Your Honor, I was

11   never told how serious this thing could get.  I will -- if

12   I --

13            THE COURT:  Mr. Srour, how did you get the

14   addresses that were provided to the Court by your attorney?

15            MR. SROUR:  I got them from the W -- you know, the

16   end of the year this year, we got everybody's W-2's, so we

17   have them all.

18            THE COURT:  So you have an accountant who prepares

19   the tax returns for your businesses?

20            MR. SROUR:  Definitely.

21            THE COURT:  And who's your accountant?

22            MR. SROUR:  His name is Harry Kowslow.

23            THE COURT:  Can you spell it, please?

24            MR. SROUR:  K-O-W-S-L-O-W.

25            THE COURT:  And do you know Mr. Kowslow's address?

1          MR. SROUR:  Baldwin, New York.  I don't know

2     exactly that.

3          THE COURT:  So it's K-O-W-S-L-O-W?

4          MR. SROUR:  Yes.

5          THE COURT:  And has he been your accountant

6     preparing your tax returns for some time?

7          MR. SROUR:  Yes.

8          THE COURT:  Now according to what was produced to

9     the Court last week, there were 106 names and addresses

10    given.  However, 22 of those names and addresses were not for

11    stores that were named as defendants in the lawsuit which

12    leaves us with 84 names and addresses.  There were 38 names

13    that were provided where no address was listed.  How did you

14    put these records together?

15         MR. SROUR:  I don't know which ones you're talking

16    about.  The one --

17         THE COURT:  I'll pass to you -- I only have the

18    copy I wrote on.  Do you have another copy?  Thank you.  No?

19    Okay.  So I'll give him the copy that I wrote on.  This -- do

20    you have another copy, Mr. --

21         MR. PETERS:  I'm checking, Your Honor.

22         THE COURT:  How about you, Mr. Borrelli?

23         MR. BORRELLI:  The one that I have has notes on it,

24    Your Honor.

25         MR. PETERS:  I appear to only have the declaration,

1     Your Honor.  No, I don't.

2           MR. BORRELLI:  Your Honor, you can -- I mean, mine

3     just --

4           THE COURT:  Mine just counts up how many stores --

5           MR. BORRELLI:  Okay.

6           THE COURT:  -- and circles Mr. Srour's name being

7     given on quite a few of the lists.

8           MR. BORRELLI:  Okay.

9           THE COURT:  This list was provided to the Court.

10    How did you get these names?

11          MR. SROUR:  Okay.  These are the ones I gave him

12    last week.  When I went around the stores because he told me

13    that he need -- I went in and looked around where we could

14    find the old files and I took a list of names from like any

15    week that I could find from each store.

16          THE COURT:  And names and addresses?

17          MR. SROUR:  Yes.  They have the addresses.

18          THE COURT:  Yes.  So where did you get those names

19    and addresses?

20          MR. SROUR:  Because they have it like the end of

21    the week report when you get from Paychex, it has their --

22    you know --

23          THE COURT:  Why didn't you produce those reports?

24          MR. SROUR:  That's what I need -- I could produce

25    those reports.  I --

19

1          THE COURT:  That's what the Court ordered you to

2     produce.

3          MR. SROUR:  I know.

4          THE COURT:  Payroll records, not your own notes.

5          MR. SROUR:  No.  These are not my own.

6          THE COURT:  Mr. Peters had to have something to

7     prepare that list.  Is that what you gave to Mr. Peters?

8          MR. SROUR:  I gave him --

9          THE COURT:  That list?

10         MR. SROUR:  No, no.  I didn't give him this list.

11    I gave him the check stubs of some of the employees and this

12    way we put it down for you.

13         THE COURT:  Mr. Peters, I don't understand why you

14    didn't produce the records that had been produced to you.

15    You gave this list to the Court last week.  Last week, the

16    Court issued an order saying it was plainly insufficient.  It

17    wasn't sworn to and there was nothing saying that this was

18    information that Mr. Srour had produced.  He's now telling me

19    that he gave you payroll records.

20         MR. PETERS:  He gave the -- something that was with

21    the payroll records, Your Honor.  However, the Court's order

22    stated that I was supposed to -- that defendant was to

23    provide names, addresses, phone numbers and some other

24    things.  They were --

25         THE COURT:  Dates of employment.

20

1          MR. PETERS:  Thank you, Your Honor.  There were

2     lots of things in the payroll records that have nothing to

3     do, of course, with the other -- with the four things that

4     the Court --

5          THE COURT:  Such as Social Security numbers which

6     you could have --

7          MR. PETERS:  Well, we could have --

8          THE COURT:  -- redacted.

9          MR. PETERS:  If I may?  May I show the -- would the

10    Court like to see -- I mean, this is a better example of what

11    I received, but would the Court like to see --

12         THE COURT:  Again, the Court wants defendants to

13    honor the Court's order and file what has been specified.  I

14    said last week that I'd give you another chance.  I gave you

15    two different dates.  I let you contact your client to pick

16    which date.  You chose the earlier date.  You could have

17    taken another week and produced the records that he's saying

18    he'll get from Paychex and we wouldn't be here having this

19    discussion.

20         MR. PETERS:  Correct, Your Honor.

21         THE COURT:  Mr. Srour.  I don't think that you're

22    understanding.  The Court has a Fair Labor Standards Act case

23    before it.  The Court has granted a collective action which

24    means that the plaintiffs' attorneys have gotten to approve

25    that all of these stores, whether or not they're still

21

1    operating or not operating, that we have to give notice to

2    the employees of each of these stores that there's a pending

3    lawsuit, that they have the opportunity to opt-in.  And the

4    Court is finding today that your failure to do so is a

5    willful violation.

6              MR. SROUR:  Your Honor --

7              THE COURT:  I will give you five days.  Five days.

8              MR. SROUR:  But --

9              THE COURT:  Five business days to produce those

10   records.

11             MR. SROUR:  May I ask you something?  What is

12   exactly you need me to get?

13             THE COURT:  The payroll records for each of these

14   stores and they're going back some time because it's not as

15   if just getting 2011 is going to do it, sir.

16             MR. SROUR:  I know.  When you say payroll records,

17   do you mean weekly reports?  Do you mean yearly reports?

18             THE COURT:  Sir, I don't think you understand.

19   Payroll records means all of it.

20             MR. SROUR:  All of it?  Okay.

21             THE COURT:  Because you have to show that you paid

22   them the proper wages and here we're just trying to get who

23   the employees were and their last known addresses.

24             MR. SROUR:  Okay.

25             THE COURT:  You're going to need those reports in

1    order to prove that you paid if, you're going to defend the

2    case, the proper wages as required the law.

3           Mr. Borrelli?  Since you have Mr. Srour on the

4    stand here, again, I'm shocked that we've come to this point

5    so early in a litigation, Mr. Peters.  What about posting the

6    notice?

7           MR. BORRELLI:  I posted the notice.

8           THE COURT:  In which stores?

9           MR. SROUR:  In the two stores that I'm operating.

10          THE COURT:  And when you did you post the notice?

11          MR. SROUR:  The same day that I told them I would.

12   That evening.

13          THE COURT:  And you understand that there can be an

14   inspection made that the notices are posted?

15          MR. SROUR:  Yes.

16          THE COURT:  And this is at the Bergament and the

17   86th Street --

18          MR. SROUR:  Yes.

19          THE COURT:  -- address?  And those are the only

20   stores that are still in operation?

21          MR. SROUR:  From the list that -- from the list

22   that he sued me under, yes.  These are the stores.  They are

23   still in operation.

24          THE COURT:  And Mr. Peters had filed again a list

25   saying that you closed stores in 2011 and I directed him to

23

1    come prepared with documents showing that those stores were

2    closed.  Did you bring those with you?

3                MR. SROUR:  Yes.  I did.

4                THE COURT:  Mr. Peters, do you have those

5    documents?

6                MR. PETERS:  I have some of the documents.  He's

7    provided a discontinuance of some of the stores.  I don't

8    have all of them yet, Your Honor.

9                THE COURT:  Can you please pass these to Mr.

10   Borrelli for him to look at and we can have copies made.

11               MR. PETERS:  Certainly.  One second, please.

12        (Pause.)

13               THE COURT:  Mr. Srour, in the December 23rd letter

14   written to the Court by Mr. Peters, he states "I have advised

15   defendants to request their payroll companies to provide the

16   names and addresses of former and present employees as soon

17   as possible.  I would like to be able to offer the Court a

18   time certain date for production of the employee records.

19   However, if defendants are ordering the discovery from a

20   third-party vendor, I cannot reasonably guess how long this

21   process will take."  Mr. Peters, did you tell your client in

22   December to get the payroll records?

23               MR. PETERS:  Yes, Your Honor.

24               THE COURT:  And we are now January 18th, sir.  What

25   did you not understand when your lawyer told you get the

1       payroll records?

2              MR. SROUR:  It's not I didn't understand.  I just

3       didn't take it very seriously to tell you honestly, Your

4       Honor.

5              THE COURT:  Well, that's your problem, sir.  I'm

6       going to give you five days to produce this information and

7       if you fail to produce the information by Monday, there will

8       be $500 sanction imposed each day that the records are not

9       produced.

10             And the $500 will be paid to the Court as a

11      sanction and we'll deal with whether or not your clients are

12      going to be prejudiced down the road.

13             Mr. Borrelli, you've been given the names.  Now

14      again, I don't know how reliable the names are that you've

15      already been given, but there are 80 -- can I have the paper

16      back that I gave you, sir?  There are 84 names listed

17      excluding Mr. Srour's name and that's not counting the two

18      stores that were not named as defendants herein.

19             I believe that we can get as an attachment to an

20      order that I'll issue today an updated notice and you can

21      send that notice immediately to see what, if anything,

22      happens.  We'll change the dates on the notice but let's get

23      the ball rolling here.

24             I'm giving him five days to produce the information

25      until Monday the 23rd from Paychex.  This will be the payroll

25

1    records.  You can redact the Social Security Numbers.  You'll

2    also provide records regarding the closure of each of the

3    stores that you claim are no longer in operation to Mr.

4    Borrelli by the 23rd.

5              MR. BORRELLI:  Your Honor, there are a few issues I

6    want to raise that some of the testimony Mr. Srour gave I'll

7    raise with Your Honor or --

8              THE COURT:  Raise it now.

9              MR. BORRELLI:  -- okay.  He had mentioned there are

10   four stores that still exit that he still maintains ownership

11   in, but just not that he's the sole owner or operator of.  My

12   first question would be are those stores defendants -- named

13   defendants?

14             MR. SROUR:  No, they're not.

15             MR. BORRELLI:  Okay.

16             THE COURT:  What are the names and addresses of the

17   four stores that you still have ownership interests in that

18   are still operating?

19             MR. SROUR:  The stores that I have ownership in is

20   Fordham Road Apparel.  It's 1-9 West Fordham Road.  And we

21   have a store named Washington Heights Center that's on 3560

22   Broadway and we have a store that -- I forgot the name of the

23   corporation.  McDonald Avenue Apparel.

24             THE COURT:  I'm sorry.  McDonald Avenue?

25             MR. SROUR:  McDonald Avenue Apparel.

1          THE COURT:  And what's the address of that store?

2          MR. SROUR:  1726 McDonald Avenue.  And we have one

3     on 3837 Broadway also.

4          THE COURT:  And what's the name of the store that's

5     at 3837 Broadway?

6          MR. SROUR:  It's a -- I forgot the name of the

7     corporation they put on it.

8          THE COURT:  This one's here.  McDonald Avenue's

9     here.  It's a different address.  It's a different address.

10    And the names that are listed on the lists that were provided

11    last week without addresses?

12         MR. SROUR:  This name?

13         THE COURT:  Yes.

14         MR. SROUR:  They have the address on the check

15    stub.  That's why I don't know.

16         THE COURT:  But again, Mr. Srour, this is your

17    duty --

18         MR. SROUR::  Yes, ma'am.

19         THE COURT:  -- as the employer and are you telling

20    me that you file tax returns each year for each of these

21    businesses?

22         MR. SROUR:  Definitely.

23         THE COURT:  And so if you file tax returns, then

24    there's going to be records.  You can prepare records.

25         MR. SROUR:  No.  I have -- I should -- I don't know

27

1    why this name is not there.  I don't know why it's there but

2    maybe they didn't --

3            THE COURT:  There's many others.  You have listed

4    people as terminated employees.  You've listed some stores

5    with only names and no addresses.

6            MR. SROUR:  Maybe the way they copied it up there.

7            THE COURT:  Who's they?  This is on you.

8            MR. SROUR:  I understand.

9            THE COURT:  This is you because you're the only

10   person that is named as an individual.  All the rest are the

11   stores.

12           MR. SROUR:  I will get you all the information that

13   you need.  I mean, I don't --

14           MR. PETERS:  Your Honor --

15           MR. SROUR:  This is not my paper.  I don't know

16   what this is.  This is not my paper.

17           THE COURT:  Mr. Peters, he's disclaiming that these

18   are not his names, the papers that were produced to the Court

19   last week.

20           MR. SROUR:  I'm not saying -- the print-out maybe

21   had the addresses but they didn't print the addresses.

22           THE COURT:  Who made that list, Mr. Peters?

23           MR. PETERS:  My office did, Your Honor.  Even with

24   the new batch, there are some names without addresses.  Not

25   many.  But there were maybe two this time that didn't have

1      addresses.  There are no phone numbers and also with the

2      records that I have there are no dates of employment, either.

3      And that's why I said what I have is insufficient, what I

4      have.  And that's what I'm --

5              THE COURT:  Mr. Peters?

6              MR. PETERS:  Yes, Your Honor.

7              THE COURT:  Please understand me in no uncertain

8      terms.  Whether or not you got everything you needed from

9      your client, it is your obligation as an officer of the Court

10     to make an application.  You have failed twice in that

11     regard, sir.  You filed a letter back in December.  You were

12     ordered to produce things at the beginning of January and you

13     were ordered to produce things after that conference and you

14     have failed twice to follow the orders of the Court.

15             MR. BORRELLI:  Your Honor, one thing that summed

16     that up for me is that Mr. Srour mentioned that the way he

17     was able to get the names for the list that was provided is

18     that he went around to the stores and looked at the reports.

19     Am I wrong in saying that I think at least one of those

20     stores was already closed?  Or more than one?  Because if

21     there were only two that are operating, how did he go around

22     to 11 different stores and looked at the payroll reports at

23     the end of the week and give us the names?

24             THE COURT:  Mr. Srour?

25             MR. SROUR:  The stores that we closed were reopened

1    under with new partners.  Some of them, they would still have

2    the records there --

3            THE COURT:  Sir, if those stores are doing business

4    whether they're been reconstituted or not, they're still

5    subject to this lawsuit.

6            MR. SROUR:  Okay.

7            THE COURT:  It's not just okay.  I don't think you

8    really understand.  This is a federal court matter.  The man

9    who is the assigned District Judge on the case used to be the

10   lead prosecutor in this District before he came the Chief

11   Judge of the Court.

12           He's no longer the Chief Judge, but you cannot come

13   into Court and just say I really didn't understand how

14   important or what I had to do here.  This could subject you,

15   besides to civil liability, if you're lying to the Court

16   under the oath, to five years in prison if you're prosecuted

17   and convicted of perjury.

18           MR. SROUR:  I'm getting you everything I know.  I

19   will get you everything the Court needs.

20           THE COURT:  Within five days, sir.  Five days.

21           MR. SROUR:  It is very tight.

22           THE COURT:  Sir, you've had since November.  You're

23   going to have $500 sanctions against you personally where

24   they can go and attach your bank accounts if you don't pay.

25           MR. SROUR:  Where do we deliver -- I mean if we

1    have to go through a lot of books, what do we do?  We send it

2    to Borrelli?

3              THE COURT:  Everything has to go through Mr.

4    Peters.  He's your attorney.

5              MR. SROUR:  Okay.

6              THE COURT:  Mr. Peters has to make copies and Bates

7    stamp them and I don't care what your weekend plans were.

8    Last weekend when you said you were going to Chicago, I

9    didn't say a word.  You picked the date, sir.  This is your

10   client.  Your client is going to be subject to 500 days until

11   this information is turned over to Mr. Borrelli.

12             And if the 86 names and addresses that have been

13   produced come out to be worthless, we'll revisit the issues

14   of what's appropriate under the circumstances in terms of

15   sanctions.

16             MR. PETERS:  Yes, Your Honor.

17             MR. BORRELLI:  Your Honor, just to clarify, am I

18   correct that the testimony is that some of the stores were

19   closed or the businesses were discontinued after the

20   commencement of the lawsuit but then reopened under a

21   different name?  Is that correct?

22             MR. SROUR:  What are you saying?

23             MR. BORRELLI:  Some of the stores that were --

24             THE COURT:  Why don't you ask a question?

25             MR. BORRELLI:  Sure.  Some of the stores that were

1    named as defendants in the lawsuit, you're familiar with

2    those stores, correct?

3              MR. SROUR:  Yes.  The names.  Yes.

4              MR. BORRELLI:  Okay.  Some of those stores were

5    closed after the lawsuit was commenced, correct?

6              MR. SROUR:  There are stores that we closed

7    completely.

8              MR. BORRELLI:  Right.  But some of the stores --

9    you have to answer my question -- were closed after the

10   commencement of the lawsuit, correct?

11             MR. SROUR:  some of the stores were closed, yes.

12             MR. BORRELLI:  All right.

13             MR. SROUR:  But we lost them when they were closed.

14             THE COURT:  After the date of the lawsuit which was

15   November 2010?

16             MR. SROUR:  Yes.  Some of them closed after --

17             THE COURT:  After November 2010?

18             MR. SROUR:  -- after -- yes.  In 2011, I closed

19   nine stores.

20             MR. BORRELLI:  Right.  Were any of those reopened -

21   -

22             MR. SROUR:  No.

23             MR. BORRELLI:  -- under a different name?

24             MR. SROUR:  The last stores that I closed

25   completely, they closed and some stores that we could not

1   continue, we brought in some partners that we reconstituted

2   under new names.

3           THE COURT:  How many of those nine stores?

4           MR. SROUR:  The stores that are closed, they

5   closed.  But the stores that we stayed -- were reopened is

6   3300 Broad -- I can give you the names.

7           MR. BORRELLI:  I mean, Your Honor, we're playing

8   games here.  So the other stores were not closed.  Just

9   because they were --

10          THE COURT:  Mr. Borrelli?

11          MR. SROUR:  No.

12          THE COURT:  Follow up on your question and get the

13  names of the stores that were reopened since 2010, sir?

14          MR. SROUR:  Right now.  2011.

15          MR. BORRELLI:  Mr. Srour, of the store that --

16          THE COURT:  We're in 2012, Mr. Srour.

17          MR. SROUR:  Oh, yes.

18          MR. BORRELLI:  Let me do it this way.  Of the

19  stores that you listed in your declaration that were closed,

20  which ones of those, when you go down the list one by one,

21  were reopened?

22          THE COURT:  Okay.

23          MR. SROUR:  Okay.  Valentine Avenue Discount

24  Center, we closed it.

25          THE COURT:  Is it still closed?

33

1          MR. SROUR:  Yes.  We closed the company and the

2     store that were reopened --

3          THE COURT:  At the same address?

4          MR. SROUR:  At the same address.

5          THE COURT:  When did you reopen at the same

6     address?

7          MR. SROUR:  In this -- in October 2011.  Around

8     there.

9          MR. BORRELLI:  It was closed in October '11 and

10    then reopened that same month?

11         MR. SROUR:  Yes.

12         MR. BORRELLI:  All right.

13         MR. SROUR:  El Mundo of 133rd Street and Broadway,

14    also we did the same thing.  We have -- we closed in

15    September and we reopened in October.  El Mundo of Amsterdam

16    Avenue is closed completely.  That was in January last year.

17    We gave it back to the landlord.  El Mundo of Jamaica Avenue

18    in January 2011, we -- I walked out from that store and the

19    manager took over the store from the -- by himself.

20         THE COURT:  But it's still open as El Mundo of

21    Jamaica?

22         MR. SROUR:  No.  The sign still says El Mundo but

23    the owner is a different owner.

24         THE COURT:  And who is that owner?

25         MR. SROUR:  His name is Assi (ph.).

34

1          THE COURT:  Assi what?

2          MR. SROUR:  Nechmais.  N-E-C-H-M-A-I-S.  He used to

3     work for me and he took it over.

4          THE COURT:  N-E-C-H-I-M-A-S?

5          MR. SROUR:  Yes.  Nechmais.  Yes.  El Mundo of

6     Knickerbocker was taken -- we gave up the lease.  Was taken

7     over by Rainbow Shop.

8          THE COURT:  So that was closed?

9          MR. SROUR:  Completely.  Yes.  Rainbow Shop is

10    there now.  El Mundo of Southern Boulevard we gave it back to

11    the landlord on August 30th.  I have no idea what they did

12    with it, but --

13         THE COURT:  It's closed?

14         MR. SROUR:  It's closed.  El Mundo of Steinway, we

15    gave it back to the landlord in July 2009.  El Mundo of

16    Willis Avenue is closed completely.  We gave it back to the

17    landlord.

18         THE COURT:  And when was that?

19         MR. SROUR:  In March 2010.  American Place at

20    Fourth Avenue, it was a sublease from Duane Reade and we gave

21    it back to Duane Reade and --

22         THE COURT:  When was that?

23         MR. SROUR:  -- January 2011.

24         THE COURT:  And it's still Duane Reade?

25         MR. SROUR:  It's closed, the store, but --

```
 1              THE COURT:  And American Place at Fourth Avenue?

 2              MR. SROUR:  That's American Place at Fourth Avenue

 3    was given back to Duane Reade.  It was a sublease from Duane

 4    Reade.  I would get --

 5              THE COURT:  And 8th Street?

 6              MR. SROUR:  You're jumping.  I don't know.  You

 7    have a different list.

 8              THE COURT:  I'm sorry.  I was on American Place at

 9    86th Street.  You went ahead to American Place at Fourth

10    Avenue.

11              MR. SROUR:  Maybe I have a different list.

12              THE COURT:  He has a different list.

13              MR. SROUR:  No, this list I'm looking at.

14              THE COURT:  Okay.  Go ahead.  That's the closed

15    list.  American Place at 86th is still open?

16              MR. SROUR:  Yes.

17              THE COURT:  It's American Place at Fourth Avenue

18    that's closed?

19              MR. SROUR:  Yes.  American Place at Nostrand, we

20    gave back the lease to -- there was a dispute between the

21    sublessee and the landlord and it wind up giving back to the

22    landlord on April 2011.

23              THE COURT:  And it's still not your store?

24              MR. SROUR:  That's not my store, no.  American

25    Place of Broadway was -- I mean, I'm going through the list
```

1    that we have -- was never a store.  This is a leaseholder

2    that we did to revamp to the sublet so there was no employees

3    there.  Thirteenth Avenue Bergament Home Center it's a store

4    that is -- we closed -- still in operation under the new

5    name.  This one is 1-9 West Fordham Road.

6            THE COURT:  Who operates it?

7            MR. SROUR:  One of my guys that we used together.

8    His name is Carlos Cartagena.

9            MR. BORRELLI:  He said 1-9 West what Road?

10           MR. SROUR:  1-9 West Fordham Road.

11           MR. BORRELLI:  Fordham Road.

12           MR. SROUR:  That was -- that one used to be 13th

13   Avenue Bergament Home Center.

14           MR. BORRELLI:  Right.  In what city?

15           MR. SROUR:  In the Bronx.

16           THE COURT:  1-9 Fordham Road?

17           MR. SROUR:  Yes.

18           THE COURT:  Go ahead.

19           MR. SROUR:  146th Street Discount Center, this is

20   also a store that we're operating right now under a new

21   entity.

22           THE COURT:  And what's the name of that entity?

23           MR. SROUR:  The new entity is 103rd and Park?  No.

24   I really don't know exactly the name.  But I know the name

25   outside is El Mundo.  But there's a --

37

1          THE COURT:  So it still says El Mundo?

2          MR. SROUR:  D/b/a El Mundo, yes.

3          THE COURT:  And it's at 158th Street?

4          MR. SROUR:  No, no.  146th Street.  That's at 3560

5    Broadway.

6          THE COURT:  And that's still in operation?

7          MR. SROUR:  Yes.

8          THE COURT:  And did you post at that store?

9          MR. SROUR:  No.

10         THE COURT:  You're required by the order to post at

11   any store in operation.

12         MR. SROUR:  Even -- even --

13         THE COURT:  Whether or not you changed the name.

14         MR. SROUR:  Oh.  Okay.  I will post it.  I was told

15   by my attorney to post only the stores that I have on the

16   list.

17         THE COURT:  You said all the other stores were

18   closed, sir.  If the stores are closed, you can't post.  If

19   you've changed the name --

20         MR. SROUR:  Okay.

21         THE COURT:  -- but the store is still in operation,

22   you must post.

23         MR. SROUR:  Okay.  I will post.  Immediately.  I

24   didn't know that I was supposed --

25         THE COURT:  Sir, you are -- continue down the list.

1    You're trying my patience that you don't know so much.

2         MR. SROUR:  No, no.  No, no.  I -- 158th Street

3    Discount Center, company that was -- we closed that store

4    September 2011.  We gave it back to the landlord.  That was

5    also a Duane Reade store.  American Department Store is still

6    -- is operated under a new entity, under McDonald Avenue

7    Apparel, so we have to post it there, also.  Window Holding

8    Company was never a store.  That was a company that we took a

9    care of our -- we had our trucks register in that company.

10   Just for the -- just so in case we have liability issues.

11   Grand Concourse Discount is closed completely, given back to

12   the landlord.

13        THE COURT:  When?

14        MR. SROUR:  In June 2011 and now it's a gym.  Grant

15   Department Store, that was a company back in -- very old

16   company, even before April 2008.  Even though I wrote

17   April --but I researched it and it was like in the year 2000.

18   I don't know if you --

19        THE COURT:  So is that a --

20        MR. SROUR:   -- that's a --

21        THE COURT:  -- store that you operated?

22        MR. SROUR:  No, no.  We closed.

23        THE COURT:  When?

24        MR. SROUR:  This store was closed in August 30th,

25   2011.  It was 3791 Broadway.  We gave it back to the

1      landlord.

2              MR. BORRELLI:  Excuse me.  Was that the Grant

3      Department Store?

4              MR. SROUR:  Yes.  Grant Department Store.

5              THE COURT:  Now we're up to Willis Avenue?

6              MR. SROUR:  Yes.  Willis Avenue Discount Center

7      also was given back to the landlord in March 2011.

8      Dominicano Department Store was -- it's the same leaseholder

9      for Grant Department Store back in 1997 when we took this

10     store so that was --

11             THE COURT:  There's no separate store that's known

12     as Dominicano Department Store?

13             MR. SROUR:  No, no.  I know it.

14             THE COURT:  That's the same as Grant --

15             MR. SROUR:  Yes.

16             THE COURT:  -- or Grand?

17             MR. SROUR:  Grant.

18             THE COURT:  Grant?

19             MR. SROUR:  It's the same one.

20             MR. BORRELLI:  And that was my concern because he

21     said that it was closed before 2000 and at another time he

22     said 2011, unless I misunderstood.

23             MR. SROUR:  And Rainbow Department Store, this is

24     the same as El Mundo of 133rd, the same store, the same

25     location.

1          THE COURT:  El Mundo of what?

2          MR. SROUR:  El Mundo Department Store, that was the

3    leaseholder back in 1990 when we took the store, but it's the

4    same operator as El Mundo of 133rd.

5          MR. BORRELLI:  So that --

6          MR. SROUR:  So --

7          MR. BORRELLI:  -- and that store's open, right?

8          MR. SROUR:  Yes.  The one I mentioned before, yes.

9          MR. PETERS:  But it's not a company.  I think he

10   said it's just a leaseholder --

11         MR. BORRELLI:  No.

12         MR. PETERS:  -- he didn't have employees.

13         MR. BORRELLI:  No.  He said he reopened it October

14   2011.  It was the same month he listed it as closed.

15         THE COURT:  Yes.  He said he closed it in 9/11 and

16   reopened it in 10/11.

17         MR. SROUR:  That's the same location, yes.

18         MR. PETERS:  But is it a leaseholder or an actual

19   company?

20         MR. SROUR:  El Mundo Department Store, the company

21   El Mundo Department Store is not existing since 1990.  It was

22   a leaseholder.

23         THE COURT:  But El Mundo of 133rd Street closed in

24   9/11 --

25         MR. SROUR:  Yes.

1          THE COURT:  -- and reopened on --

2          MR. SROUR:  Yes.

3          THE COURT:  10/11.

4          MR. SROUR:  Yes.  Yes.

5          THE COURT:  Continue on.

6          MR. SROUR:  Five Star Department Store was for the

7    same as Valentine Avenue Discount was the leaseholder back in

8    1992 when we took the building, but it doesn't exist any more

9    but it's still in operation right now.

10         THE COURT:  The Valentine Avenue --

11         MR. SROUR:  Yes.

12         THE COURT:  -- Discount Store?

13         MR. SROUR:  Yes.  Yes.  Yes.  Under a new entity

14   obviously.  Kingstone Distributor was also a leaseholder back

15   in 1997 for 3560 Broadway.

16         MR. BORRELLI:  You skipped Hamilton Variety.

17         MR. SROUR:  Hamilton Variety Company was the same

18   as 3300 Broadway also.  That was a very old company also,

19   before the year 2000.

20         THE COURT:  And I'm sorry.  Kingstone?

21         MR. SROUR:  Yes.  Kingstone Distributors?

22         THE COURT:  Yes.

23         MR. SROUR:  It's a leaseholder for 3300, 3560

24   Broadway.

25         MR. BORRELLI:  You mentioned before that there are

42

1  nine stores that closed but there's much more than nine,

2  correct?

3         MR. SROUR:  I said nine stores -- I believe -- I

4  didn't count how many stores I closed in 2011 but between

5  2010 and 2011, I closed a lot of stores.

6         THE COURT:  How many are open and operating today?

7  I don't care what name they're under.

8         MR. SROUR:  That I own myself or I own with other

9  people?

10         THE COURT:  With others.  It doesn't matter.

11         MR. SROUR:  It doesn't matter.  It's seven stores,

12  three in Brooklyn, three in upper Manhattan and two in the

13  Bronx.  That's eight stores.

14         THE COURT:  And are they listed, the addresses

15  on --

16         MR. SROUR:  Yes.

17         THE COURT:  -- as defendants in this action?

18         MR. SROUR:  No.  I mean, the addresses are there,

19  yes.  Just that we changed the --

20         THE COURT:  Names were changed, so --

21         MR. BORRELLI:  Yes.

22         THE COURT:  all eight stores are in operation?

23         MR. SROUR:  Yes.

24         THE COURT:  And that means that you have the

25  obligation to post the notice at all eight stores.

43

1          MR. SROUR:  I will do that immediately.

2          THE COURT:  Mr. Borrelli?  You're trying to do the

3     count on whether we have eight stores?

4          MR. BORRELLI:  Yes.  I mean, we have Valentine

5     Avenue, El Mundo of 133rd, El Mundo of Jamaica --

6          MR. SROUR:  No.  Jamaica is not there.

7          MR. BORRELLI:  -- except your manager took it over

8     and --

9          THE COURT:  Nechmais?

10          MR. SROUR:  Yes.  But it's not my store.  He

11     doesn't -- he owns it.  I don't own it.

12          THE COURT:  But it's named as a defendant here.

13          MR. SROUR:  Oh, yes.

14          THE COURT:  I don't care.  You -- again, you are

15     the only one that was named individually, but his store is

16     named -- El Mundo of Jamaica is still in operation.

17          MR. SROUR:  No.  Your Honor, El Mundo of Jamaica

18     was my company.

19          THE COURT:  Yes.

20          MR. SROUR:  I walked out.

21          THE COURT:  Yes.

22          MR. SROUR:  And he wanted the job, so he went and

23     he took the store on his own.

24          THE COURT:  Yes.

25          MR. SROUR:  You're saying that.

44

```
 1              THE COURT:  There's still liability, sir.

 2              MR. SROUR:  Against him?

 3              THE COURT:  Against you --

 4              MR. SROUR:  Oh, yes.  No.

 5              THE COURT:  -- for operating the store.

 6              MR. SROUR:  Before, yes.  But the store's closed

 7    now.

 8              THE COURT:  But again, sir, if he is just a shell

 9    that's in place, I don't know what the transaction was.  I

10    don't need to speak to it now.  If that store is still in

11    operation as an El Mundo store, it's been named in a federal

12    lawsuit.  It must post the notice and it must comply with

13    giving records.

14              MR. SROUR:  Even though it has nothing to do with

15    me?

16              THE COURT:  You're named as an individual here,

17    sir.  However, the stores are named as companies.

18              MR. SROUR:  Okay.

19              THE COURT:  Unless he has completely disbanded the

20    corporation and reconstituted under a different name, if this

21    company is named, I don't care who the manager is.

22              MR. SROUR:  Yes.  This company is dissolved.  He

23    opened his own store, his own business.

24              THE COURT:  I haven't seen any proof --

25              MR. SROUR:  Oh, okay.
```

1          THE COURT:  -- that the company was dissolved.

2          MR. SROUR:  Oh, okay.

3          THE COURT:  And if the store was in operation until

4     and we don't know the date on this one, it's still in

5     operation but we don't know when it was closed under your

6     management, but you are being sued for not paying the wages

7     that are required under the Federal Labor Law and the New

8     York State Labor Law and that obligation goes back under

9     state law, could be six years.

10         And under federal law, if they're still in

11    operation, sir, and they're named as a company and you have

12    not produced anything to show they're disbanded, they're

13    liable.

14         Continue on with telling me which stores are the

15    eight stores that you're still operating so that I know -- I

16    am going to get the records for those eight stores.

17         MR. BORRELLI:  Your Honor, I believe we're at six.

18    I'm adding the six there and then the two Bergament outlets

19    and an American Place 86th Street equal eight.

20         THE COURT:  But he said three Brooklyn, three in

21    Manhattan, two in the Bronx.  The Bergament and the

22    Bergament's in Brooklyn and the American Place is in Brooklyn

23    as well.  Isn't that correct?

24         MR. SROUR:  The 86th Street is in Brooklyn, yes.

25         THE COURT:  So there's one more store in operation

1        in Brooklyn --

2                  MR. SROUR:  Yes.

3                  THE COURT:  -- there are three in Manhattan and two

4        in the Bronx.

5                  MR. SROUR:  Yes.

6                  THE COURT:  Can you tell me which those are?

7                  MR. SROUR:  Okay.  The third one in Brooklyn is

8        American Place which we call now McDonald Apparel, 1726

9        McDonald Avenue.

10                 THE COURT:  Do you have that address, Mr. Borrelli?

11                 MR. BORRELLI:  I do as was mentioned before.

12                 THE COURT:  Go ahead.

13                 MR. SROUR:  The one in the Bronx and upper

14       Manhattan we have 3300 Broadway.

15                 MR. BORRELLI:  3300?

16                 MR. SROUR:  Yes.

17                 THE COURT:  And what's the name of that store?

18                 MR. SROUR:  That's what we called as you know El

19       Mundo of 133rd.  And the seventh one as you know over here in

20       this list as 146th Street Discount Center is 3560 Broadway.

21                 THE COURT:  3560?

22                 MR. SROUR:  Yes.  And the one you called -- they

23       have it here under American Place of Broadway has a

24       leaseholder which is 3837 Broadway.

25                 THE COURT:  And this is --

47

1          MR. SROUR:  Still --

2          THE COURT:  -- still Manhattan?

3          MR. SROUR:  Yes.

4          THE COURT:  And that's American Place -- I'm sorry?

5          MR. SROUR:  As known over here, American Place of

6      Broadway.

7          THE COURT:  And what's the address?

8          MR. SROUR:  3837 Broadway.  And the two stores in

9      the Bronx, we have the Valentine Avenue at 2510 Valentine

10     Avenue.

11         THE COURT:  I'm sorry, sir.  I'm trying to locate

12     it on the list.  Say it again.

13         MR. SROUR:  Valentine Avenue Discount.

14         THE COURT:  Okay.

15         MR. BORRELLI:  Okay.  It's right there.

16         MR. SROUR:  Which is 25 --

17         THE COURT:  The first one --

18         MR. SROUR:  Yes.

19         THE COURT:  -- that was sued.

20         MR. SROUR:  2510 Valentine Avenue and the other one

21     was the one we spoke about is 1-9 West Fordham Road.

22         THE COURT:  And what's the name of that?

23         MR. SROUR:  El --

24         THE COURT:  That's El Mundo?

25         MR. SROUR:  -- El Mundo.  El Mundo, also.  Yes.

1          MR. BORRELLI:  That one was formerly 13th Avenue

2     Bergament Home Center?

3          MR. SROUR:  Yes.

4          THE COURT:  Now again, I am quite amazed that you

5     didn't understand that a court order of the Federal Court

6     should be given its -- should be given your highest priority.

7     I've never had this situation.  Never.  We now have eight

8     stores that you have to get the payroll records for.  And you

9     have to get them by Monday.  And you can produce the payroll

10    records.  You don't have to produce pay stubs for each of

11    these.  They had to pay according to something that was fed

12    into some -- they don't do payroll records by people calling

13    them and say, "Cut a check to so-and-so."  They get records

14    and they computerize the print-outs.

15         MR. BORRELLI:  And just so I'm clear, the

16    testimony, Mr. Srour, none of the records or any of the

17    stores' payroll records are kept on a computer?

18         MR. SROUR:  They're kept by Paychex.  We have the

19    envelopes that they deliver every week.

20         MR. BORRELLI:  How does Paychex get the

21    information?  How do they know what to pay each employee?

22         MR. SROUR:  The managers, after they check in the

23    time clock at the end of the week, they call up Paychex on

24    Monday and Wednesday they deliver the check.

25         MR. BORRELLI:  Do they send something in writing to

1    Paychex?

2              MR. SROUR:  No.  They do it over the phone, I

3    think.

4              MR. BORRELLI:  So the manager of the store orally

5    reports the hours of each employee to Paychex?

6              MR. SROUR:  Yes.

7              MR. BORRELLI:  And Paychex then cuts the check

8    based on the information that they're told orally?

9              MR. SROUR:  Yes.  And then we get the checks and we

10   have -- we give it to the employees.  Usually the employees

11   take cash anyway.

12             MR. BORRELLI:  But is the punch clock computerized?

13             MR. SROUR:  It's a punch clock.

14             MR. BORRELLI:  Who totals up all the hours for each

15   employee?

16             MR. SROUR:  This I don't know exactly.

17             THE COURT:  You understand you're under oath?

18             MR. SROUR:  Yes, I do.

19             THE COURT:  And you understand that if you're

20   saying that a manager calls in the information to Paychex,

21   Paychex better have information?

22             MR. SROUR:  Definitely.  Paychex will have

23   information.

24             THE COURT:  Okay.  You have your eight stores and

25   you have employees going back for six years to produce.

1    Well, again, according to the list that you gave us --

2              MR. BORRELLI:  Three years, Your Honor, I mean --

3              THE COURT:  But under the wilfulness, 2008 to 2011

4    is what I've ordered.

5              MR. BORRELLI:  Yes.

6              THE COURT:  But get the Paychex records whether or

7    not you're going to produce them so that you can show if

8    there's --

9              MR. SROUR:  Can I ask -- can I ask Your Honor

10   something?

11             THE COURT:  Yes.

12             MR. SROUR:  When you say 2008?

13             THE COURT:  Yes.

14             MR. SROUR:  You mean the full year 2008, full year

15   2009, full year 2010?

16             THE COURT:  It's actually from I believe 2008 in

17   November until the present.

18             MR. SROUR:  So that's --

19             THE COURT:  November of 2008 until the present.

20             MR. SROUR:  Oh.  So November 8 [sic] -- November

21   2008 so we start December and on?

22             THE COURT:  No.  November, December, January --

23             MR. SROUR:  That's right.  Yes.

24             THE COURT:  -- February.  November of 2008 'till

25   the present must be produced to Mr. Borrelli.

1           MR. PETERS:  Your Honor, he's supposed to produce

2      the four things.  I'm trying to figure out if he's going -- I

3      got to -- I don't know.  I was going to come up with when

4      these people worked there, as you could see that it seems

5      like that the record keeping was a little shaky --

6           THE COURT:  Mr. Peters?

7           MR. PETERS:  Yes, Your Honor.

8           THE COURT:  I think you should stop talking.  He

9      said that the Paychex company is going to have the

10     information.  If he hasn't gotten on the phone already to

11     them, he should be driving out to pick up the information,

12     perhaps with his attorney, because this is a serious matter.

13     He's the one that's personally on the hook and line.

14          He's got eight stores that he needs to post in

15     immediately.  He's only posted in two.  Plaintiffs can go and

16     inspect to make sure that there is a posting in a public area

17     that the employees can see.  Do you understand?

18          MR. PETERS:  I do.

19          THE COURT:  If he didn't understand before, you

20     must understand now that if there's a judgment entered

21     against your companies, that this is something that the

22     plaintiffs could try to attach bank accounts on, could try

23     to -- they're going to be entitled to get tax returns.

24     They're going to be entitled to see what the accountant says

25     about preparation of these -- it doesn't make a whole lot of

1    sense to me that somebody's staying on a phone once a week

2    and going over punch cards.  That's not generally how

3    business is conducted, but if that's what your client is

4    swearing to under penalties of perjury, he'd better get

5    something to back it up.

6              MR. PETERS:  Yes, Your Honor.

7              THE COURT:  Do you understand, Mr. Srour?

8              MR. SROUR:  That's what we do to get the payroll.

9    Unless --

10             THE COURT:  That's what you're going to get.

11   You're going to get the Paychex company to give you the

12   payroll records.  Mr. Borrelli, do you have other questions?

13             MR. BORRELLI:  Just one more issue I want to follow

14   up on.  In producing the first list of names you have in

15   front of you, I believe you testified earlier -- you went

16   around to the stores to get those names.  Is that correct?

17             MR. SROUR:  Yes.

18             THE COURT:  What about the stores that are closed?

19   How did you get the names off of there?  Those stores --

20             MR. SROUR:  There are stores that are closed that I

21   thought that we didn't have a lot of files on that, but I

22   realize that some files they were in different locations, so

23   we're not -- I have to organize it this week and get you all

24   the information.

25             MR. BORRELLI:  You have to organize what this week?

53

1          MR. SROUR:  Get myself -- get all the files or

2     whatever I have.  Go over them the right way just so we can

3     get you the information for the stores that are closed.

4          MR. BORRELLI:  Your files were available to you two

5     weeks ago, right?

6          MR. SROUR:  No.  I didn't know we had -- they were

7     not -- I thought that when we closed the stores, we didn't

8     have them but I realize that we -- when I went to work after

9     George told me that it's very serious matter, I realized I

10     have I believe a decent amount of files that are organized

11     and I can get them.

12          MR. BORRELLI:  And the roof that collapsed in the

13     Bergament Outlet Center, did you file insurance claim for

14     that --

15          MR. SROUR:  Yes.

16          MR. BORRELLI:  -- damage?

17          MR. SROUR:  Yes.  I never collected nothing with

18     that file.

19          THE COURT:  When was that snowstorm, sir?

20          MR. SROUR:  Last -- I think right after Christmas.

21     The day after Christmas last year.

22          THE COURT:  And what records do you say were lost

23     in that snowstorm?

24          MR. SROUR:  We had a lot of records, but we lost

25     everything that was in the room and we took them out.

54

1          THE COURT:  Records for all the stores were kept in

2     one store?

3          MR. SROUR:  No, no, no.  I thought that we had

4     records of payroll and invoices, old invoices and clothing

5     and -- but I realize that records for the -- some invoices,

6     some stores, older ones were there, like 2006, 2005.  So I

7     have to do my work to get all the information.  But truly,

8     five days is very tight.

9          THE COURT:  Sir, you've had since November.

10         MR. SROUR:  I know that.  But I --

11         THE COURT:  And you haven't paid any attention to

12    this matter.

13         MR. SROUR:  I'm willing to pay attention to this

14    matter as long as -- I tell you honestly, five days to get

15    everything done, I would need ten days.  Please.

16         THE COURT:  Sir, you have had since November.

17         MR. SROUR:  I understand.

18         THE COURT:  I was going to hold you in contempt if

19    you failed to appear here today.  I am going to sanction you

20    $500 per day.  Do you understand?

21         MR. SROUR:  From Monday?

22         THE COURT:  If they're not produced by Monday, each

23    day after Monday that you fail to produce, $500.  Do you

24    understand?

25         MR. SROUR:  I understand.  But can we do it ten

1    days, please?

2              THE COURT:  No.  You had since November.  You

3    haven't paid any attention.

4              MR. SROUR:  No.  I was -- okay.

5              MR. PETERS:  Your Honor, if I may?  Originally you

6    stated that you would give him five business days.  He's down

7    from business days to five straight days and two of those

8    days as you know, are a weekend where Paychex will not open.

9    Today is Wednesday afternoon and then he'd only have two days

10   to get the information to Paychex and get it back.  I don't

11   mind working on weekends --

12             THE COURT:  I will believe that that's a reasonable

13   argument.  I was giving you five business days so I will give

14   you until the 25th.

15             MR. PETERS:  Thank you, Your Honor.

16             MR. SROUR:  Thank you.

17             THE COURT:  The 25th it is.

18             MR. SROUR:  Thank you.

19             THE COURT:  And each day after the 25th, starting

20   on the 26th, there will be a sanction imposed of $500

21   personally on Mr. Srour until this information is produced.

22   I am directing you, Mr. Borrelli, to start sending out the

23   notices.  I'll have it ECF'd with the new dates.

24             I am directing you, Mr. Srour, to get the notice

25   posted in all eight stores and to submit a sworn declaration

1    that it has been posted in all eight stores and the date that

2    it was posted.  Yes?

3              MR. PETERS:  Your Honor, can we have the location

4    of where it's posted?  Is that sworn to as well?  So if we do

5    want to have somebody inspect it they know where to look.

6              THE COURT:  So in other words, where in the store

7    it's been posted?  It's supposed to be posted in a

8    conspicuous place.  It's put into the order that it should be

9    in a place that employees can view it.

10             MR. PETERS:  It seems that the plaintiff is over-

11   reaching.

12             THE COURT:  Excuse me?

13             MR. PETERS:  It seems that the plaintiff is over-

14   reaching.

15             THE COURT:  Have you read the memo and order of the

16   Court regarding what was ordered?

17             MR. PETERS:  I did, Your Honor.

18             THE COURT:  And it does say that there is supposed

19   to be a notice posted in each of the stores and it gives the

20   notice.

21             MR. PETERS:  Correct.  And then defendant never

22   received it.  However, the Court's order did not state that

23   he has to state where it was posting the notice.

24             THE COURT:  Well, that's because I thought this was

25   going to be a normal *Felissa* case where the defendant was

1    going to produce the information ordered by the Court and I

2    didn't think that we were going to have to get down to these

3    sort of issues.

4              MR. SROUR:  We --

5              THE COURT:  Just wait one moment.  It says

6    defendant shall post and plaintiff shall mail the approved

7    notice of pendency.

8              It said that the names, last known addresses,

9    telephone numbers, dates of employment should be  provided to

10   plaintiffs' counsel by November 18th.

11             As you know, that was extended on the request of

12   your first attorney and I'm looking to see whether or not it

13   says -- it says on the employee bulletin boards and in other

14   common areas conspicuous to all employees in each of the

15   stores.  That's document 27, page 19 and I want a sworn

16   statement that it's been posted not just in compliance with

17   the order, but as it says -- on the employee bulletin board

18   or in the common area conspicuous to all employees.

19             And then again Mr. Borrelli can dispatch anybody to

20   go to any of the stores and if they file a sworn statement

21   that it wasn't posted, again, I can have a hearing on that

22   issue.  Do you understand, Mr. Peters?

23             MR. PETERS:  I do understand, Your Honor.

24             THE COURT:  Mr. Srour?  Do you understand?

25             MR. SROUR:  Yes, I do.

58

1          MR. BORRELLI:  The final thing is, and I touched on

2     it earlier and I was definitely rebuked, but one of the

3     things I have not seen thus far are any phone numbers and I

4     don't know if his company would have phone numbers.  I guess

5     he can go --

6          THE COURT:  He'll go through those files that he

7     was starting to put together and look for phone numbers.  Now

8     again, I want there to be a diligent search made.  I've given

9     you until the 25th on your second application.  I will not

10     give more time.  $500 a day as of the 26th and you know how

11     to get things delivered to Mr. Borrelli so that he gets it by

12     the 25th.  You could fax it to him.  You could e-mail it to

13     him.  But this has to be the records from Paychex.  This is

14     not going to be your handwritten list that he could then

15     disavow that he doesn't know how that list was created.  Do

16     you understand?

17          MR. PETERS:  Yes, Your Honor.

18          THE COURT:  Mr. Borrelli?

19          MR. BORRELLI:  Last thing from the plaintiff, Your

20     Honor.  In our first motion to compel, we asked Your Honor

21     for any relief she deems just and proper.

22          At this point, we want to move for attorneys' fees

23     not for the motion to compel, not for the subsequent phone

24     call to the motion to compel, but for the in-court conference

25     last week and the in-court conference today which are --

1          THE COURT:  As you well know, if you're successful

2     under *Felissa,* you can make an application for attorneys'

3     fees.  Keep track of your time.

4          I would more appreciate and I'm being frank here --

5     I can't be the only one doing the legal work to try to

6     support what you think is the proper path for the Court to

7     take when there's willful disobedience to a Court order.  I

8     haven't gotten any legal help from you, Mr. Borrelli, on that

9     point.

10          MR. BORRELLI:  Understood.

11          THE COURT:  I'm fashioning this as I see fit and

12     I'm giving Mr. Srour because he did appear here today and I

13     believe his testimony was forthright because he didn't try to

14     withhold addresses and he did state that there were a number

15     of businesses that were reopened.

16          I'm not speaking to the legality of changing names

17     or horses in mid-stream, but I'm not sanctioning him today

18     because he appeared.  I am giving him until the 25th to

19     produce the additional information.

20          Starting on the 26th there will be a $500 sanction

21     per day leveled against him each day that these records are

22     not produced to you, Mr. Borrelli, and I want to hear from

23     you both by the end of the day on the 26th.

24          It could just be a letter to the Court that records

25     have been produced, that you're working together to make sure

```
1    that all records are complete, that there has been an

2    affidavit signed under penalty of perjury that the notices

3    were posted in all eight stores on such-and-such date by so-

4    and-so, sworn to.

5              MR. SROUR:  May I ask you one more question?

6              THE COURT:  Yes, Mr. Srour.

7              MR. SROUR:  The records from Paychex, did they

8    need -- can we because when they give it to us, they give us

9    like the weekly -- the names of the person, his name, his

10   address, his Social Security and how much he got paid.

11             THE COURT:  You're going to need all those records

12   for this lawsuit.  Those records are important.  All that

13   you're required to turn over now is the information that the

14   Court has ordered.  The name, the address, the telephone

15   number.

16             You don't have to turn over Social Security numbers

17   now and those weekly payroll records will be something that

18   Mr. Borrelli will be asking for during discover if that

19   person opts-in to the lawsuit.

20             MR. SROUR:  Oh, okay.  That's all I wanted to know.

21             THE COURT:  Is there anything further -- you may

22   step down, sir.

23             MR. SROUR:  Thank you.

24             THE COURT:  Is there anything further on behalf of

25   the plaintiff, Mr. Borrelli?
```

1            MR. BORRELLI:  No, Your Honor.

2            THE COURT:  Is there anything further on behalf of

3     the defendants?

4            MR. PETERS:  No, Your Honor.

5            THE COURT:  And you do have records with you that

6     you said that you could make copies of?  I had my law clerk

7     stay here to make the copies of the closing records for

8     whatever help that will be.

9            Mr. Borrelli, quite frankly, Mr. Srour gave us a

10    number of other names today -- his accountant, *etcetera*.

11    These are things that may be useful down the road.

12            I'll change the notice that was attached to my

13    order in order to bring the dates into compliance with where

14    we are today.  I'll just update the dates of people opting

15    in.  As far as whether or not the plaintiffs who do opt-in

16    were prejudiced, we'll deal with that at a later time.

17            And quite frankly, Mr. Peters, there won't be much

18    room for your client to argue that the date because generally

19    speaking, the date that a plaintiff opts in is where you

20    count the statute of limitations.

21            He's not going to have a very good time to argue

22    that they should be help to the opt-in date if there's a

23    notice that could have been issued going back to November.

24    But we'll deal with that down the road.

25            Is there anything else on behalf of either side?

62

1    Everybody understands what needs to be filed by the 26th and

2    don't make it after Court hours on the 26th.

3                MR. PETERS:  No, Your Honor.

4                THE COURT:  Because the Court sanction order will

5    be prepared and ready to go.

6                As of today, your client has been given notice

7    clear and explicitly that if he fails to provide this

8    information, the payroll records, regarding these stores by

9    next Wednesday, January 25th, to plaintiff's counsel and

10   fails to provide a sworn statement that he has posted the

11   notice as required by the Court order by that date.  He has

12   to file a sworn statement that it's already posted, not that

13   he intends to post it, then there will be a $500 sanction

14   leveled against Raymond Srour personally for each day until

15   there is compliance.  And that's under Rule 37.  Are you

16   clear?

17               MR. PETERS:  I am certainly clear, Your Honor.

18               THE COURT:  And Mr. Srour, are you clear?

19               MR. SROUR:  Yes.

20               THE COURT:  Okay.

21               MR. PETERS:  Your Honor, if I may?  One last thing.

22   The form that was submitted or that we're planning on

23   submitted.  You know, like a general Word document or Excel?

24   Is that sufficient for the Court or do you want --

25               THE COURT:  No.

63

1    MR. PETERS:  -- the payroll checks unredacted and

2    based on --

3    THE COURT:  I don't want payroll checks

4    necessarily.  I want payroll records.  Now again, I would

5    prefer that they were issuing checks because they were given

6    names of people and they were given an address and a phone

7    number.

8    In order to prepare things for the business records

9    of each employee of each store, usually there is lists in

10   other ways.  Whether it's something that you did for your tax

11   returns.  Whether you gave it to the accountant or you gave

12   it to the Paychex company, I don't care.

13   But I don't want you preparing the list that Mr.

14   Srour can then disavow that that's not how they kept the

15   list.

16   MR. PETERS:  Your Honor, can I offer something to

17   the Court to show what the type of --

18   THE COURT:  Give it to Mr. Borrelli.  Don't give it

19   to the Court.

20   (Pause.)

21   MR. BORRELLI:  It looks like Mr. Peters has handed

22   me W-2 statements for individual employees.  Certainly it

23   appears that they only would have worked that year so it

24   looks like those are the names, addresses, store that they

25   worked at --

64

1          THE COURT:  Again, you could -- you can delete the

2     Social Security Number because that wasn't something that you

3     were required.  It doesn't have the phone number so you have

4     to look through other records to see if there are phone

5     numbers.

6          But those records for the year that you've produced

7     them here, I don't know if they're complete -- that every

8     employee was given a W-2.

9          If every employee was and you have W-2's for every

10    single employee at every single store that lists the name and

11    address and that's the last known address that you have for

12    them because if somebody started working for you in let's say

13    2008, they could have changed addresses.

14         So you have to give last known address, you're

15    supposed to give dates of employment and you're supposed to

16    give the store that they worked at and that would be a

17    sufficient business record, the W-2.

18         MR. PETERS:  Okay, Your Honor.  But that's my point

19    is that the W-2 will not have their phone number or their

20    dates of employment.

21         THE COURT:  And that's why I'm saying look on the

22    other information files that Mr. Srour has.  Compile the

23    information.

24         I'm sure that Mr. Borrelli would be happier to get

25    the W-2's than to get your handwritten or your typed list

1    because at least this is something that he could use down the

2    road if he needed to use that information.  So you can redact

3    the Social Security Number, provide that.  Go to Paychex, get

4    their information.  Pass it back, Mr. Borrelli.

5              MR. BORRELLI:  Sure.

6              THE COURT:  And by next Wednesday.

7              MR. PETERS:  And I could take that out.  We'd ask

8    that we could delete the amount that they were paid --

9              THE COURT:  At this point in time you can, but at a

10   later date in the litigation if they do opt-in, it may be

11   relevant to show how much they were paid for that period of

12   time.

13             Okay.  I think we're on a better road here.  You

14   start getting all the notices out to the people you already

15   have and let's see what information comes back by next

16   Wednesday and we'll see where to go after that.  With that,

17   we're adjourned.  Thank you.

18             MR. PETERS:  And -- oh.

19             THE COURT:  Oh, yes, Mr. Peters?

20             MR. PETERS:  Your Honor, you stated that you were

21   going to give a new notice or --

22             THE COURT:  It's going to be attached to the ECF

23   order that I'm putting out after today's conference so that

24   the old order used dates that they had to opt-in by January.

25   That's not going to be relevant now because they have to be

1        given a sufficient time so I'm just going to update the dates

2        in the notice.

3                  It's going to have the same language of the notice

4        that was attached to the November order.  November?  October

5        order.  November order.

6                  So this was document 27 and the notice was attached

7        and we're just going to update the notice and attach it to

8        the minute order that I'm filing today reflecting that we're

9        going to have the information submitted, payroll records, by

10       the 25th.  Again, that sanctions.  He's going to give them

11       notice and an opportunity to be heard and I am imposing

12       sanctions starting on the 26th -- $500 personally each day

13       until the information's produced.

14                 MR. BORRELLI:  Your Honor, would it be appropriate

15       for the date on the notice to reflect the 25th with the

16       assumption that we're going to have the records on that date

17       as opposed to let's say today if there issues that would

18       shorten the opt-in period for the peoples' names and

19       addresses --

20                 THE COURT:  I'll put an extra five days on the opt-

21       in period.  So again, I'd rather have the notice reflect

22       today --

23                 MR. BORRELLI:  All right.

24                 THE COURT:  -- so that you could start sending it

25       to the 84 people whose addresses you've been provided and I

1    won't cut you off for those five extra days that I'm giving

2    to Mr. Srour -- five business days -- until the 25th.  So

3    I'll count the week from today for purposes of the notice to

4    give the extra time to the people to opt-in.

5              Anything else today?

6              MR. BORRELLI:  No, Your Honor.

7              THE COURT:  The matter is adjourned.

8         (Proceedings concluded at 4:28 p.m.)

9         I, CHRISTINE FIORE, Certified Electronic Court Reporter

10   and Transcriber and court-approved transcriber, certify that

11   the foregoing is a correct transcript from the official

12   electronic sound recording of the proceedings in the above-

13   entitled matter.

14

15   *Christine Fiore*

16   _____          January 24, 2012

17        Christine Fiore

18

19

20

21

22

23

24

25